NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230667-U

NO. 4-23-0667

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 10, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| KESHON McCLINTON, | ) | No. 18CF240 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John M. Madonia |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding defendant did not prove all the required factors to mitigate his conviction to second degree murder, he was not denied the effective assistance of counsel, and the trial court did not err by declining to conduct a *Krankel* hearing (see *People v. Krankel*, 102 Ill. 2d 181 (1984)).

¶ 2    After a bench trial, defendant, Keshon McClinton, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) for shooting and killing Javonne Harris. On appeal, defendant claims no rational trier of fact could find he failed to prove the required factors to mitigate his conviction to second degree murder (*id.* § 9-2). Defendant, therefore, requests that we vacate his conviction and remand with instructions that the trial court find him guilty of second degree murder and hold a new sentencing hearing. Alternatively, he contends he received ineffective assistance of counsel, or the court erred by failing to inquire further after he filed a *pro se* motion seeking a new trial.

¶ 3        We affirm.

¶ 4                        I. BACKGROUND

¶ 5        In March 2018, defendant shot and killed Javonne Harris at a gas station in Springfield, Illinois. He was indicted on charges of first degree murder (*id.* § 9-1(a)(1), (2)) and aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)). He pled not guilty, raised self-defense as an affirmative defense, and waived his right to a jury trial. Before trial, on the State's request, the trial court declared Donotello Harper a material witness.

¶ 6        At trial, the State presented testimony from witnesses to the shooting. Latonya Buchanan testified she worked as a cashier at the gas station in Springfield on the night of the shooting. Javonne was a regular customer, but she did not know his name. She was checking out other customers when she heard Javonne's brother, Tyrell Harris, tell someone, " 'I keep it on me too.' " Soon after, Tyrell punched another customer, defendant's uncle, Terrence McClinton, in the face. After that, she saw "swinging," and she ran to the back of the store. She testified she did not see anyone with a gun, but she heard gunshots.

¶ 7        Lauraine Bauza testified she was standing in line at the gas station when other customers began to argue. Two customers fought, and defendant took out a gun. Bauza "froze like a deer in the headlights," so she saw the entire encounter. She saw Javonne enter the store. Defendant shot him in the arm, then chased after him with the gun. She testified defendant shot Javonne again and said, " 'This is how real men take care of s***.' " She acknowledged, on the day of the shooting, she had told police defendant said this before drawing the gun, rather than after firing the second shot. Bauza saw only one gun during the entire altercation.

¶ 8        Charles Kirk testified that he worked for a vending company stocking shelves and setting up displays. On the night of the killing, he stopped at a gas station. He was standing a few

feet away from the checkout counter, when he saw two people arguing, and someone took out a gun. He claimed the shooter said, " 'I keep one on me at all times.' " When asked about his previous statement that the person standing in front of him by the checkout counter said this, he testified he believed the shooter said it. The victim was shot in the arm and started to run out of the gas station. Kirk testified the victim was shot a second time as he was trying to leave. Kirk confirmed he saw only one firearm. Regarding the fight, Kirk claimed someone other than the shooter threw the first punch, but the shooter was one of the two combatants.

¶ 9 Donotello Harper did not appear at the trial. During their investigation, police officers had interviewed Harper, and the interview was recorded. The parties stipulated to the video of Harper's interview being admitted into evidence. According to the State, both parties found "his interview to be advantageous for the case they want[ed] to make." When the parties discussed the stipulation in court, the judge asked, "So I'm going to hear from a witness who isn't going to be subject to cross-examination, and that doesn't concern you, counsel?" Defense counsel replied, "It does not, Your Honor."

¶ 10 In the recorded statement, Harper told police he accompanied Terrence and defendant the night of the shooting. Inside the gas station, Harper heard Tyrell say, "I keep it on me," and he heard defendant respond, "Likewise," or, "One in the same." He saw Tyrell reaching for his pants, but he did not see any other gun besides defendant's gun. Terrence jumped in front of Tyrell, and Tyrell punched Terrence. Harper said he saw defendant wave a gun, so he left the gas station, and he heard gun shots. Harper told police he and defendant went back to the car and drove away. In the car, Harper heard defendant say something about Tyrell "trying him like a b***" and, "dude was tryin' me."

¶ 11　　　　　Springfield police officers testified they responded to reports of a shooting at a gas station around 4 a.m. the day of the alleged murder. The officers found Javonne just outside the door of the gas station, next to a pool of blood. Tyrell was panicked, and he had to be restrained so first responders could tend to Javonne. No weapons were recovered from the crime scene. A detective assigned to the case testified that she arrived at the scene and viewed security camera video of the shooting, which was admitted into evidence. One officer recorded body camera video, and that video was also admitted into evidence. The body camera video showed the officer approach the gas station. Javonne was on the ground, and blood was pooling near his head. Tyrell grabbed Javonne and emotionally shouted at him, "Don't leave me bro," and, "Keep breathing."

¶ 12　　　　　Sergent Jeremy Oldman testified he was a detective at the time of the shooting. Oldman interviewed Harper, and he confirmed the video accurately reflected his interview. The video was admitted without objection. Oldman's interview with defendant after his arrest was also played in court.

¶ 13　　　　　Oldman then described the surveillance camera video from the gas station, which was played in court. Oldman identified the individuals in the videos. In one of the videos, when Javonne runs through the entrance and sees defendant, he briefly appears to raise his hands before running away. Defendant then pursues Javonne out the door with his gun pointed at him.

¶ 14　　　　　Defense counsel cross-examined Oldman about the videos. Oldman acknowledged Tyrell threw the first punch. He agreed, from the first punch to the second shot, only about 19 seconds passed. He also agreed that, when Javonne entered the store, he was running. Oldman acknowledged defendant claimed in his interview he thought Tyrell did not have a gun because Tyrell would have pointed it at him, but defendant thought Javonne did have a gun.

¶ 15         After the State presented its case, defendant moved for a directed finding, arguing the State failed to prove all the elements of first degree murder beyond a reasonable doubt. The trial court denied the motion.

¶ 16         Defendant took the stand. He was 23 years old at the time of the trial and 18 years old when he shot Javonne. He testified he travelled to Springfield before the shooting to visit his family. He spent some time at his mother's house with his relatives, including his mother and his uncle, Terrence. He testified he did not drink or smoke that night. He got in a car with Terrence and his mother around 1:30 a.m., and they picked up Harper.

¶ 17         Defendant testified they stopped at a gas station, and Terrence told him he wanted defendant to come in with him. On his way to the back of the store, defendant and Tyrell brushed shoulders. Defendant testified the store was small, so he thought it might have been an accident. Afterwards, as defendant stood in line at the checkout counter, Tyrell cut in front of him, so defendant stepped out of line to wait for Terrence. Defendant confirmed he had never met Tyrell before.

¶ 18         Defendant explained that while he was waiting, Tyrell said, " 'I always keep that .40 shorty.' " Defendant believed this to mean Tyrell had a .40-caliber pistol with him. Defendant asked him, " 'What do you mean by that?' " and Tyrell said, " 'You know what I mean. I keep that .40 on me.' " Defendant testified he looked at Terrence, Terrence looked at him, and defendant shook his head because he knew Terrence was protective of family members. Terrence asked Tyrell, " 'Why you talking to my nephew like that?' " Tyrell then punched Terrence in the face.

¶ 19         Defendant testified he was afraid because Tyrell threatened him with a gun and punched his uncle. He drew his gun because he thought Tyrell would reach for his own gun. He pointed the gun at Tyrell, but he did not shoot because he felt he was not in immediate danger.

¶ 20        Defendant testified that a couple of seconds later, Javonne ran through the door and ran toward defendant. Defendant described his thoughts at the time as follows: "I know one guy just threatened me with a gun, and now another guy is running towards me while I have a gun out. So I'm—honest-to-God truth—I was scared. I was afraid, and I'm thinking that he may be the guy with the gun." Defendant testified that he shot Javonne because he feared Javonne had a gun. Javonne ran back toward the door, and defendant shot him again. Defendant claimed he did not know his first shot struck Javonne when he fired the second shot. Defense counsel asked defendant why he fired the second shot, and defendant responded:

> "Because I'm still afraid that someone has a gun, and I was scared, you know, and, you know, honestly, it was just an—it was just spur-of-the-moment. I'm afraid, you know, and the fact that he's the one that ran in after Tyrell said he had a gun, I didn't see Tyrell go for his gun, and I didn't know if Javonne was trying to get a gun or use a gun or—I was still afraid that a gun may still be pulled against me or my family."

After defendant shot Javonne a second time, he, Terrence, and Harper ran to their car.

¶ 21        On cross-examination, defendant testified he did not feel "threatened" when he first walked into the store. After Tyrell bumped into him and cut in front of him in line, he still did not feel "threatened." He denied saying "Likewise" or referencing a gun when Tyrell said he was armed. He did not remember who threw the first punch. He did not remember saying, "This is how real men handle s***," but he testified, "I don't remember what was said from—actually, almost just about everything was kind of like haywire, so I really don't remember what was said at that point." Regarding Harper's claims about defendant's statements in the car after the shooting, defendant testified he did not remember what was said.

¶ 22          After the close of evidence, the trial court allowed defendant to argue self-defense or mitigation to second degree murder because the court found defendant introduced at least some evidence to support self-defense. In closing arguments, the State relied on Harper's report of defendant's statements after the shooting to argue defendant shot Javonne because he felt disrespected, not out of fear of harm. Defense counsel argued Tyrell was the aggressor, defendant believed Javonne had a gun, and defendant was provoked and believed he needed to defend himself. Defense counsel asked the court to find defendant acted in self-defense, or, at least, that his conviction should be mitigated to second degree murder.

¶ 23          The trial court found defendant guilty of first degree murder. Regarding provocation, the court found "zero evidence to support that claim. Not by a preponderance, not by any standard." Addressing "imperfect self-defense," the court reasoned as follows:

> "Did the defendant establish the factors by a preponderance of the evidence that would support a theory of self-defense, albeit imperfect? Those factors, whether force is threatened against a person, again, by reasonable inference, Javonne Harris running into the store with reckless abandon, I guess under the circumstances, someone could potentially believe that that person was there to threaten force against them.
>
> But the danger of that threat and the harm that was presented by that threat must be imminent. And the person threatened must not be the aggressor. And the Court finds that those two factors prevent a finding that this was an imperfect self-defense claim."

¶ 24    The trial court reasoned any possibility of self-defense was eliminated when Javonne saw the gun, stopped, backed away, and put his hands up. Addressing defendant, the court said:

> "And yet, for whatever reason—and I would submit to you there's a certain sense of empowerment. Whatever you're describing as being scared I think is mistaken for empowerment.
>
> And I think that gun in your pocket empowered you more than you ever thought it could or would. But that sense of empowerment is what caused that trigger to be pulled. It wasn't fear, it wasn't legitimate fear of harm. And that's with the first strike."

¶ 25    The trial court found "any threat of harm" was eliminated when Javonne responded to the first shot by fleeing. The court concluded:

> "Unmistakably at that point, there is no harm that is imminent, [defendant] has become the aggressor, and the defense of self-defense fails. By a preponderance-of-the-evidence standard, those factors were not proven, and what we have here is senseless gun violence resulting in the loss of a life and what will ultimately be a confinement and another statistic.
>
> I do believe the evidence to be overwhelming in this case including and especially the second shot of a defenseless person fleeing in fear."

¶ 26    Defendant filed a motion for a new trial, *pro se*. He claimed his "6th Amendment constitutional right" was violated (see U.S. Const., amend. VI), explaining, "I have the right to face my accuser & my material witness Donatello Harper did not show up at my trial." He added, "Being able to face my accuser physically in court is my 6th Amendment constitutional right &

my rights were violated once his video statement was used against me without being subject to cross[-]examination due to his absence for my trial." Defense counsel also filed a motion for a new trial.

¶ 27    At the hearing on the motions, the trial court asked defense counsel to comment on defendant's *pro se* motion. The court said, "Typically I would not allow a motion filed by the Defendant when he has counsel representing him, especially when that motion does not mention a *Krankel* [(*People v. Krankel*, 102 Ill. 2d 181 (1984))] concern, at least one that the Court does not identify as a *Krankel* concern." Defense counsel incorporated defendant's motion into his own motion for a new trial. Defense counsel then told the court he had wanted to use Harper to establish that Tyrell said he was armed with .40-caliber pistol. Before trial, he was concerned the State would object to questioning about Tyrell's statements as hearsay. By stipulating to the admission of Harper's entire interview into evidence, defense counsel ensured Harper's statements about Tyrell were admitted as well.

¶ 28    Regarding defendant's claims about Harper, the trial court found the parties diligently attempted to locate him to obtain live testimony, and most of his interview was cumulative. Other testimony already established that someone other than defendant made comments about the firearm. The court further explained:

> "There could be some argument that what was said in the vehicle after the facts should have been subject to cross-examination. But based on his absence and the needs of both parties, a stipulation and a compromise was achieved. And the Court does not find any prejudice sufficiently that would warrant a new trial in the way that the Donotello Harper testimony was considered by this Court. I do not find it

to be anywhere near prejudice that would result in a new trial, especially based on the totality of the evidence observed by the Court." The court denied the motion for a new trial.

¶ 29        The trial court sentenced defendant to 20 years' incarceration for murder, an additional 25 years for using a firearm to commit murder, and 3 years of mandatory supervised release. Defendant filed a motion to reconsider the sentence, which the court denied.

¶ 30        This appeal followed.

¶ 31                        II. ANALYSIS

¶ 32        On appeal, defendant raises three issues. First, defendant contends he proved the required factors to mitigate his conviction to second degree murder, so he asks us to vacate his conviction and sentence for first degree murder and remand for sentencing on second degree murder. Second, he argues we should vacate his conviction and remand for a new trial because his trial attorney provided ineffective assistance of counsel. Third, he insists the trial court failed to properly address his *pro se* motion after trial. We affirm.

¶ 33                  A. Second Degree Murder

¶ 34        First, defendant argues he proved the necessary factors to mitigate his conviction to second degree murder. "The question of whether a defendant's actions were committed under mitigating circumstances" is a factual question. *People v. Romero*, 387 Ill. App. 3d 954, 967-68 (2008). When the factfinder determines a mitigating factor is not present, the question presented on appeal is "whether the fact finder correctly concluded that the defendant did not prove the existence of a mitigating factor by a preponderance of the evidence." *Id.* at 967. We will uphold the factfinder's determination if we find, "after viewing the evidence in the light most favorable

to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

¶ 35　　　　　Here, defendant waived his right to a jury trial and opted for a bench trial. When the trial court acts as the finder of fact, "the responsibility of weighing the credibility of the witnesses rests with the trial court." *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 145. The appellate court " 'will not substitute its judgment for that of the trial court on questions involving the credibility of witnesses.' " *Id.* (quoting *In re Jessica M.*, 399 Ill. App. 3d 730, 738 (2010)). " '[T]he trial court's findings of fact are given great weight,' " but " 'they are not conclusive where *** the finding is unsupported by the testimony given at trial.' " *Id.* ¶ 146 (quoting *People v. Jones*, 404 Ill. App. 3d 734, 746 (2010)).

¶ 36　　　　　The State charged defendant with first degree murder. Section 9-1(a)(1)-(2) of the Criminal Code of 2012 (Code) states as follows:

　　　　　"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

　　　　　(1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

　　　　　(2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(1)-(2) (West 2022).

¶ 37　　　　　Section 9-2 of the Code provides a defendant commits second degree murder if he or she commits first degree murder, but a mitigating factor is present. *Id.* § 9-2(a). One such mitigating factor is if, "at the time of the killing[,] he or she believes the circumstances to be such

- 11 -

that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." *Id.* § 9-2(a)(2). When the defendant presents evidence of a mitigating factor, the defendant bears the burden of proving the mitigating factor by a preponderance of the evidence. *Id.* § 9-2(c). The Code further explains the "burden of proof, however, remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing." *Id.*

¶ 38 "One of the recognized justifications to first degree murder is the affirmative defense of self-defense." *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). Before the factfinder can consider self-defense, the defendant must introduce some evidence of the following elements:

> "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35.

After a defendant introduces self-defense, the State bears the burden of proving beyond a reasonable doubt that at least one of these six factors was absent. *Jeffries*, 164 Ill. 2d at 128. If the State does so, "to be found guilty of second-degree murder, *the defendant* must prove by a preponderance of the evidence that all of the first five factors were present." (Emphasis in original.) *Castellano*, 2015 IL App (1st) 133874, ¶¶ 149, 160 (citing *Jeffries*, 164 Ill. 2d at 129); see *People v. Hernandez*, 2023 IL App (4th) 221020-U, ¶ 24.

¶ 39 Here, the trial court, acting as the factfinder, found the State proved the elements of first degree murder beyond a reasonable doubt. This included a finding that the murder was

committed without lawful justification. Thus, the court rejected defendant's claim he was not guilty of murder because he acted in self-defense. Defendant does not challenge this finding on appeal.

¶ 40 The trial court also rejected defendant's claim his conviction should be reduced to second degree murder where defendant did not prove the first five elements of self-defense by a preponderance of the evidence. Specifically, the court found, after Javonne ran through the door, "under the circumstances, someone could potentially believe that that person was there to threaten force against them." However, the court explained, "the danger of that threat and the harm that was presented by that threat must be imminent. And the person threatened must not be the aggressor. And the Court finds that those two factors prevent a finding that this was an imperfect self-defense claim." Later, the court found defendant was not motivated to shoot Javonne by "legitimate fear of harm," but by the "sense of empowerment" the gun provided.

¶ 41 Defendant disputes these findings rejecting mitigation to second degree murder. Defendant argues he was not the aggressor, but Tyrell was. Tyrell bumped into defendant's shoulder and cut in front of him in line. He then told defendant he had a gun twice. Finally, Tyrell started the fight by punching Terrence, defendant's uncle, in the face. Defendant also claims he believed shooting Javonne was necessary to prevent imminent harm. Tyrell intimidated defendant and threatened him with a gun. Defendant testified he thought Javonne must have a gun because Tyrell had not shown the gun he claimed to have. Although defendant fired the second shot as Javonne was running away, this was only a few seconds after the first shot, and defendant did not know the first shot hit Javonne.

¶ 42 After reviewing the record, we find a rational trier of fact could reach the trial court's conclusions. See *Blackwell*, 171 Ill. 2d at 358. Beginning with who acted as the aggressor,

all the evidence showed Javonne ran into the store, saw defendant, was shot, ran away, and was shot in the back. Javonne did not strike defendant, brandish a firearm or any weapon, or threaten defendant. Javonne did not even raise a fist against defendant. When Javonne saw defendant's gun, he raised his hands, showing he was unarmed. Even if defendant interpreted Javonne running toward him as a threat, Javonne eliminated any potential suggestion of aggression toward defendant by raising his hands and running away. Defendant was undeniably the aggressor.

¶ 43       The same facts and reasoning confirm defendant did not face any imminent harm from Javonne. Not only did Javonne not threaten defendant or brandish any weapon, but no weapons were found at the crime scene. Defendant was the one person who drew a gun and fired. Moreover, Javonne was fleeing when defendant killed him. Defendant claims he did not see Javonne raise his hands and the entire encounter lasted only a few seconds, but defendant certainly saw Javonne run away, and he never saw Javonne with a gun. We therefore find sufficient basis in the record to uphold the trial court's finding. See *People v. Johnson*, 227 Ill. App. 3d 800, 806-07 (1992) (upholding a factfinder's verdict of first degree murder, rather than second degree murder, when the defendant shot the victim in the back as he was fleeing and the victim was unarmed).

¶ 44       Because we uphold the trial court's finding that defendant did not prove at least two of the five factors required to mitigate his conviction to second degree murder, we need not address whether defendant "actually and subjectively believed a danger existed that required the use of the force applied." *Washington*, 2012 IL 110283, ¶ 35. We also need not address defendant's argument that we should consider defendant's age or defendant's and Javonne's race in determining what defendant believed. We affirm defendant's conviction and sentence for first degree murder.

¶ 45                    B. Ineffective Assistance of Counsel

¶ 46    Defendant next argues he received ineffective assistance of counsel. He claims his attorney's decision to stipulate to the admission of Donotello Harper's entire recorded interview constituted ineffective assistance. He also contends his attorney unreasonably failed to object to the admission of the police officer's body camera video or to hearsay statements in the video of defendant's interrogation by police, and these failures cumulatively deprived him of a fair trial.

¶ 47    Criminal defendants have the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). To succeed on his ineffective assistance claim, defendant must show "(1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). "In demonstrating, under the first *Strickland* prong, that his counsel's performance was deficient, a defendant must overcome a strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy." *Id.* "Regarding the second *Strickland* prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004). "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). We review ineffective assistance of counsel claims *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 48    First, we address defense counsel's stipulation to the admission into evidence of Harper's recorded interview with police. In the video, Harper says that, when he was in the gas station, he heard Tyrell tell defendant, "I keep it on me, I keep it on me," and defendant responded, "Likewise." Harper further told police that, after the shooting, defendant told him Tyrell was "trying him like a b***" and, "dude was tryin' me." According to defendant, Harper's statements about what defendant said before and after the shooting were hearsay, and defense counsel's stipulation to their admission into evidence was unreasonable and prejudicial.

¶ 49    Initially, we note Harper had not appeared to testify at trial. Before trial, at the State's request, the trial court had declared him a material witness. This was the context in which defense counsel decided to stipulate to the admission of Harper's recorded statement. By stipulating to the recorded statement, defendant's attorney abandoned the opportunity to cross-examine Harper, but the State also abandoned the opportunity to fully develop the testimony of its material witness. Although defendant's attorney's ability to use Harper to support the defense was limited to what Harper said in the recording, the State was similarly limited in the information it could seek from the person it labelled as a "material witness." Overall, defendant's attorney made a strategic decision in response to an unexpected complication at trial, and we are reluctant to find ineffective assistance of counsel based on a matter of trial strategy. See *People v. Palmer*, 162 Ill. 2d 465, 476 (1994) ("[C]ounsel's strategic choices are virtually unchallengeable."); see also *People v. Stewart*, 104 Ill. 2d 463, 492 (1984) ("Mistakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent.").

¶ 50    At a hearing on defendant's posttrial motion, defendant's trial attorney explained his motivation for stipulating to the admission of the recording. He told the trial court he wanted to ensure Harper's recorded statement that Tyrell said he had a gun was admitted into evidence.

Defendant's attorney thought that, without the stipulation, if Harper testified in person, then the State would object to questions about hearsay statements Tyrell made.

¶ 51    Defendant insists his attorney's decision was unreasonable. He accepts Tyrell's statement that he had a gun was hearsay, but he argues the State's own witness, Buchanan, already testified she heard Tyrell say he had a gun. Defendant contends his attorney should have realized the State would not object if defense counsel asked Harper about Tyrell's hearsay statement when the State elicited similar testimony in its own case-in-chief. Defendant also testified he heard Tyrell say he had a gun. Defendant argues Harper's statement was cumulative, so it was unnecessary. However, defendant argues Harper's claims that defendant responded to Tyrell, "Likewise," and later told Harper Tyrell was "tryin' " him hurt his case. Defendant points to the State's reliance on the statements after the shooting in its closing arguments. Defendant claims his attorney should not have allowed Harper's prejudicial comments into evidence for the sake of his cumulative statements about Tyrell's gun.

¶ 52    We do not find these arguments sufficient to overcome the strong presumption in favor of considering counsel's conduct sound trial strategy. Defendant's trial counsel could reasonably have concluded defendant's statement, "Likewise," was irrelevant. Defendant did not dispute he had a gun, so his trial counsel could have decided his statement acknowledging this in response to Tyrell's threat would not cause any further harm to his case. Similarly, the statement that Tyrell was "tryin' " defendant could potentially be interpreted as demonstrating defendant's belief that he felt threatened, or at least his trial counsel could have predicted the trial court might view those statements this way. Although the State mentioned these statements in its closing argument, when the court explained its findings, it did not mention Harper's interview at all, suggesting none of these statements had a significant impact. The facts that mattered to the court—

that the unarmed victim raised his hands and ran away but defendant still chased him and shot him in the back—were not affected by these statements in the Harper recording, and defendant's attorney might have expected this.

¶ 53 However, Tyrell's statement that he had a gun was essential to defendant's case. The only plausible basis for defendant's self-defense or mitigation argument was if someone threatened him with imminent harm. Although defendant testified Tyrell told him about the gun, his attorney could have worried the factfinder would not trust defendant's testimony. Although Buchanan testified she heard Tyrell say he had a gun, another witness, Kirk, testified defendant first stated he had a gun, not Tyrell. Defendant argues Kirk's testimony was less reliable because Kirk was impeached. This is true, but considering how important Tyrell's statement was to defendant's case, we find his attorney could reasonably have concluded Harper's confirmation of Tyrell's statement was worth the risk posed by his report of defendant's statements before and after the shooting. We do not necessarily find trial counsel's decision was best, but defendant has not overcome the strong presumption it was reasonable.

¶ 54 Defendant relies on *People v. Mejia*, 247 Ill. App. 3d 55, 65 (1993). There, a jury found the defendant guilty of two counts of reckless homicide. The State's case depended on the testimony of two police officers, who testified they saw the defendant crash his car, causing the death of his two passengers. *Id.* at 56-58. After the officers testified, the State tendered to the defense counsel police reports indicating the officers had previously told other officers they did not actually see the crash. *Id.* at 59. Defense counsel informed the trial court of the reports but did not ask for any remedy. *Id.* at 60. Instead, the State and defense counsel stipulated to the information contained in the reports. *Id.*

¶ 55　　　　The appellate court reversed the defendant's convictions based on ineffective assistance of counsel. *Id.* at 66. First, and apart from any issue with the stipulation, the defendant's attorney made arguments based on a key witness that he never called to testify. *Id.* at 63. Second, he stipulated to the admission of police reports contradicting the State's witnesses, but he did not call the authors of the reports to testify, and he had not subpoenaed them. *Id.* at 63-64. After he received the reports, the defense attorney did not even ask that the police officers who testified be recalled so he could impeach them with the reports. *Id.* at 65. The appellate court found this constituted ineffective assistance, because "[a] stipulation is no match for in-court live impeachment and is not properly used for that purpose. A reasonable standard of representation dictates that defense counsel subject the State's case to 'meaningful adversarial testing.' " *Id.*

¶ 56　　　　We find *Mejia* distinguishable. First, none of defendant's claims of ineffective assistance are as egregious as the *Mejia* attorney's argument based on a witness who never testified. *Id.* at 63-64. Moreover, in *Mejia*, the State's case against the defendant relied on the "pivotal" testimony of the police officers, and the defendant's attorney failed to impeach them by cross-examining them about their own previous statements indicating they did not even see the crash. *Id.* at 65. Here, defendant does not indicate he had any of Harper's prior inconsistent statements with which to impeach him. More importantly, the statements he now objects to in Harper's interview were, at best, tangential to the State's case. Finally, the *Mejia* attorney said he agreed to the stipulation instead of live testimony " 'so as to not delay this trial in any form.' " *Id.* at 64. But, here, defendant's attorney attempted to use the recorded statement to get Tyrell's hearsay statement admitted into evidence, avoiding a possible objection. Unlike in *Mejia*, here, defendant's attorney was acting based on a reasonable trial strategy.

¶ 57        Defendant also argues his attorney's performance was deficient because he failed to object to the police body camera video and to hearsay statements reported in the video of defendant's police interrogation. The body camera video shows an officer arriving at the gas station and attempting to talk to witnesses, while another officer crouches down to look at Javonne, who is on the floor and bleeding from his head. The video also shows Tyrell grabbing Javonne and shouting, "Keep breathing." Defendant argues his attorney should have objected to the admission of the video its admission because it was irrelevant and more prejudicial than probative. The interrogation video shows defendant talking to police officers in an interrogation room. During the interrogation, the detective told defendant his mother had said she had a "hard time believing" that defendant "could have done this," and she expressed concern defendant "could even carry a gun on him" because of the pants he was wearing. Defendant claims these statements suggest defendant's mother believed defendant was the type of person who would carry a gun, but she was surprised a gun could fit in the pants he was wearing that day. Defendant contends these statements presented him in a negative light, and his attorney should have moved to redact them. Defendant argues his trial counsel's combined failures caused prejudice, and he was denied effective assistance of counsel. See *People v. Bell*, 152 Ill. App. 3d 1007, 1011 (1987) (reversing the defendant's conviction because of the "cumulative effect of trial counsel's errors").

¶ 58        Even if defendant's attorney erred, we find none of these alleged errors caused prejudice. See *People v. Givens*, 237 Ill. 2d 311, 331 (2010) ("If it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient."). We start from the presumption the trial judge "consider[ed] evidence only for the limited and proper purpose it serves." *People v. Mujkovic*, 2022 IL App (1st) 200717, ¶ 20.

Defendant has not persuaded us the trial court considered any improper evidence. The trial court did not mention either the image of Javonne in the video or defendant's mother's statements when it explained its reasons for finding defendant guilty. Most importantly, defendant's mother's statements about his pants, the body camera video, and even defendant's statements before and after the shooting have no bearing on whether defendant shot an unarmed man in the back as he was running away, which was the basis of the trial court's decision. Defendant has not shown he was prejudiced by his attorney's decisions. Thus, we find no ineffective assistance of counsel.

¶ 59                                    C. *Krankel* Hearing

¶ 60         Finally, defendant argues the trial court erred by failing to inquire into his *pro se* motion for a new trial, pursuant to the supreme court's case law following *Krankel*. When a defendant alleges ineffective assistance of counsel *pro se* after trial, the trial court must inquire into those allegations. *People v. Ayres*, 2017 IL 120071, ¶¶ 10-11 (citing *Krankel*). The trial court must inquire into the factual basis of the defendant's claims and determine if the defendant's attorney so neglected the case that the court should appoint a new attorney. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). To prompt a *Krankel* inquiry, the defendant need only "bring his or her claim to the trial court's attention." *Id.* at 79. The defendant may raise his claim "orally" or "through a letter or note to the court." *Ayres*, 2017 IL 120071, ¶ 11. If the defendant does not explicitly allege ineffective assistance of counsel, the trial court need not inquire further if the defendant's complaint "is amenable to more than one interpretation." *People v. Taylor*, 237 Ill. 2d 68, 77 (2010). We review whether the trial court was required to conduct a *Krankel* inquiry *de novo*. *Moore*, 207 Ill. 2d at 75.

¶ 61         Defendant argues his *pro se* posttrial motion should have prompted a *Krankel* inquiry. The motion argued the introduction of Harper's recorded interview violated his sixth

amendment rights because Harper was not subject to cross-examination, and defendant now argues this motion clearly critiqued his trial attorney's performance. Defendant claims his motion was not subject to more than one interpretation. In support of this claim, he points to the hearing on his motion, where his attorney attempted to explain his decision-making, and the trial court found defendant did not suffer prejudice from the recording. Defendant argues the motion and the comments at the motion hearing demonstrate his motion was unambiguous and should have triggered further inquiry.

¶ 62    We find the trial court did not err in declining to conduct a *Krankel* hearing. Defendant's *pro se* motion did not explicitly allege ineffective assistance of counsel. Although defendant's motion cited the sixth amendment, the right he relied on was clearly and unquestionably his right to confront witnesses. He claimed, "I have the right to face my accuser & my material witness Donatello Harper did not show up at my trial." He also argued:

> "[Harper] didn't show up so his statement shouldn't have been admitted as evidence to convict me. Being able to face my accuser physically in court is my 6th amendment constitutional right & my rights were violated once his video statement was used against me without being subject to cross examination due to his absence for my trial."

The only references to any specific right are to the right to confront witnesses. The motion does not mention the right to an attorney, and the motion did not mention defendant's attorney at all. See *Taylor*, 237 Ill. 2d at 77 (finding no *Krankel* inquiry was needed where nothing in the defendant's statement specifically informed the court that he was complaining about his attorney's performance). We find the motion is more easily interpreted as arguing defendant's right to confront witnesses was violated rather than his right to effective assistance of counsel. The

discussion of his motion at the hearing does not convince us otherwise. The trial court explicitly stated defendant's "motion does not mention a *Krankel* concern," or at least the court did not recognize any *Krankel* concern. We agree with the trial court's evaluation of defendant's motion. Accordingly, we deny defendant's request to remand for a *Krankel* hearing.

¶ 63                                         III. CONCLUSION

¶ 64            For the reasons stated, we affirm the trial court's judgment.

¶ 65            Affirmed.