**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240433-U

Order filed December 30, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0433 Circuit No. 22-CF-569 |
| | ) | |
| JOHN MAGEE, JR., | ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BERTANI delivered the judgment of the court.
Justices Davenport and Anderson concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*:  (1) Defendant's notice of appeal adequately vests this court with jurisdiction to consider the trial errors identified on appeal; and (2) defendant's trial counsel rendered ineffective assistance when stipulating to the admission of a nontestifying witness's videotaped police interview that implicated defendant without benefiting the defense.

¶ 2   Following a jury trial, defendant John Magee Jr. was convicted of first-degree murder for the fatal shooting of DeArrion Harris and sentenced to 45 years' imprisonment. On appeal, defendant argues that he was denied effective assistance of counsel when his trial counsel (1)

waived his sixth amendment right to confrontation by stipulating to the admission of a nontestifying witness's videotaped police interview that identified defendant as the individual who shot and killed the victim and forwent impeachment of that witness with his numerous felony convictions, (2) failed to object to the foundation of the State's firearms identification expert's testimony linking bullet shell casings recovered from the crime scene to a recovered firearm connected to defendant, and (3) failed to cross-examine the firearms identification expert on the reliability of his discipline. Defendant also asserts the circuit court's evidentiary ruling denying his request to admit a report from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) related to the recovered firearm denied his right to a fair trial.

¶ 3        Before reaching the merits of the appeal, we consider the jurisdictional issue raised by defendant's motion for leave to file a late notice of appeal that was taken with the case. In sum, contrary to the motion's title, defendant requests to perfect a timely-filed notice pursuant to Illinois Supreme Court Rule 606(c) (eff. April 15, 2024). For the reasons that follow, we deny defendant's motion but hold that the notice of appeal vests this court with jurisdiction and conclude that defendant was rendered ineffective assistance of counsel. We reverse his conviction, vacate the sentence entered on the judgment, and remand for a new trial.

¶ 4                                                    I. BACKGROUND

¶ 5        In the early afternoon of November 13, 2014, Harris was shot and killed at his apartment near the intersection of East Birch Street and North Harrison Avenue in Kankakee, Illinois. He was 26 years old.

¶ 6        On September 23, 2022, defendant was indicted on two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2022)), and one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2022)), for the alleged shooting of Harris. The record indicates that the

aggravated battery count was dismissed before the cause proceeded to a five-day jury trial on the first-degree murder counts in late February and early March 2024.

¶ 7                                    A. Trial

¶ 8        In its opening statement, the State presented Harris's murder as the result of a drug turf war. It forewarned the jury that many of the witnesses set to testify had disreputable pasts, specifically identifying Jerry Bledson, a close associate of defendant, as someone that the jury would dislike based on his extensive criminal background. However, the State underscored the importance of Bledson's testimony as "an eyewitness to the entire crime."

¶ 9        Dr. Valerie Arangelovich, a forensic pathologist, performed Harris's autopsy on November 14, 2014. She testified that Harris had three gunshot wounds, two of which fatally struck his heart and lungs. His wounds indicated that he had not been shot at close range.

¶ 10       Felicia Wilson resided on North Harrison Avenue and was defendant's neighbor in November 2014. She testified that on the day of the shooting, she walked to defendant's house to assist with his newborn child around 11:30 a.m. Defendant's girlfriend and her friend were present in the apartment at that time. Defendant arrived about 10 minutes later and told his girlfriend he "was finna do something crazy." Suspecting potential danger, Wilson immediately returned home, kept her children indoors, smoked marijuana, and surveilled her neighborhood. She heard sirens and witnessed paramedics removing Harris's body on a stretcher a short time later.

¶ 11       Bledson testified that he had known defendant all his life as a family friend who was a bit older than him and thought of him as somewhat of a mentor. After Bledson was paroled in 2014, he resided with defendant until defendant moved to his Harrison Avenue residence. Together they sold drugs from defendant's apartment. Harris, who resided next door, sold drugs in the same vicinity, which created tension between Harris and defendant.

3

¶ 12    Earlier on the day of the shooting, Bledson witnessed Harris verbally confront defendant near their apartments concerning their competing drug operations. Bledson left before returning in his car later in the day. He positioned himself in the alleyway behind the residence to sell drugs. Defendant was in a nearby parked vehicle at that time. About 10 to 15 minutes after Bledson arrived, defendant, in a tan coat and black pants, approached Bledson and stated that he was "finna go holler at" Harris. Defendant walked over to Harris's apartment, knocked on his door, and Harris stepped outside. An "aggressive" argument ensued. Bledson then saw defendant, with his right hand, pull a black 9-millimeter, Hi-Point handgun from his coat pocket and shoot multiple times at Harris. Bledson had seen defendant with that gun before. Defendant and Harris were 10 to 15 feet apart. Harris was unarmed. Bledson immediately fled the scene in his car.

¶ 13    He had a phone conversation with defendant a day or two later during which defendant revealed he was hiding out in Minnesota and that he had thrown the murder weapon "in the creek or something by the Reed's Rent All." Bledson was not questioned by police until approximately eight months after Harris's death when Bledson was in police custody for an unrelated offense. Bledson identified defendant as the shooter in a photo array. He also identified the weapon and conveyed the information from his phone call with defendant. He was cross-examined on his extensive criminal history and was serving a seven-year sentence in federal prison for extortion at the time of trial. He did not receive consideration for his testimony.

¶ 14    Duquan Walton, a friend of Harris's, testified that on the day of the shooting, he was "chilling" with Harris and others outside of an apartment on Harrison and Birch. He then left for the corner store several blocks away. As he returned, Walton heard gunshots and came upon Harris on the floor bleeding. Walton testified to seeing a man carrying a gun running from the scene of the crime but equivocated on details. About a month after the incident, police interviewed Walton,

4

and he identified defendant as the shooter when presented with a photo array. Walton could not recall the details of this interview at trial, attributing his lapse of memory to the passage of time and drug use. He had been charged with a Class X felony in 2014 or early 2015 that was reduced to a Class 1 felony. He did not receive consideration for his testimony.

¶ 15       Justin Larusso was a customer of Harris's who testified that he saw Harris twice on the day of the shooting. When approaching Harris's apartment door that morning to purchase drugs, someone from behind him yelled, "Hey, come here. Check it out," apparently trying to attract his business. He then witnessed Harris in a verbal altercation with the beckoning man. Harris retrieved a baseball bat from his apartment and returned outside where a "bunch of voices yell[ed] over each other." The argument eventually deescalated. Larusso purchased his drugs and left. He returned about three or four hours later to purchase more drugs. He knocked on the door and someone behind the door responded, "Is he gone, or something like that." The door was opened and Larusso saw Harris's body lying on the floor.

¶ 16       The police interviewed Larusso the day after the shooting and a video of the interview was admitted and played in court. 725 ILCS 5/115-10.1(c)(2)(C) (West 2024). During the interview, he told the police that the man who initially approached him had gotten out of a car and wore a tan and brown leather coat with "money signs" on it. He identified defendant as this individual and the one who argued with Harris when presented with a photo array. However, at trial he asserted a lapse in memory, did not recall identifying defendant in the photo array, claimed to have only identified defendant in the brown coat because other "people" informed him of that fact, and asserted that he did not look behind him during the verbal altercation on the morning of the shooting. He acknowledged a litany of prior convictions for criminal offenses.

5

¶ 17    Quincy Campbell was scheduled to testify during the third day of trial. On the morning of his scheduled testimony, Campbell's counsel informed the State and defendant's counsel that his client was "going to potentially" invoke his fifth amendment right against self-incrimination. Prompted by the court's questioning, the State conveyed this information to the court and indicated it would not be offering Campbell immunity in exchange for his testimony.

¶ 18    That afternoon, the State read a stipulation into the record before playing a videotaped interview Campbell gave to Kankakee Police detectives, with a minor redaction. The stipulation noted that the interview was conducted on October 26, 2018, pursuant to a signed proffer agreement. The parties stipulated to its foundation and had no objection to its admission and publication to the jury. The court did not directly inquire whether defendant himself consented to the stipulation. The record is devoid of the reason defense counsel entered into the stipulation.

¶ 19    The video depicts Campbell in an orange jumpsuit and handcuffed. He affirmed that he spoke to the police on November 20, 2014, and told them that he did not see the individual who shot Harris. He acknowledged that this statement was untruthful. He lied due to fear of becoming involved in the case and being caught up in the "ripple effects" of a murder but had in fact seen what transpired.

¶ 20    According to Campbell, he set out on the day of the shooting to visit his grandmother who resided on East Birch near Harris's apartment. After parking, he saw a friend across the street. They greeted each other and after a brief conversation, walked into Harris's apartment together. Harris was seated at a table in the company of several other individuals. Campbell went to the bathroom and while washing his hands, overheard Harris say, "Bro, this guy is talking pistol talk." Those in Harris's apartment then went outside while Campbell watched from near the apartment doorway. From his view, he saw Harris ask defendant to fight, while defendant stood silent with

6

his hands inside his coat pockets. Bledson was standing next to defendant. Defendant then removed an "automatic *** black" handgun from his coat pocket and started shooting at Harris. Defendant was the only individual present with a gun. Campbell witnessed defendant shoot twice before quickly turning back into the apartment and barricading himself inside a bedroom. After hearing additional shots, he exited the bedroom and saw Harris on the floor, bleeding from the mouth. Concerned because he had been recently paroled, he left soon after the police arrived. He estimated that he had arrived at the scene only 5 to 10 minutes before the shooting. Campbell also identified defendant in a photo array during the interview and in the accompanying questionnaire recognized him as the "guy who killed" Harris. Campbell signed both the photo array and questionnaire, which the State published the documents to the jury after his videotaped interview concluded.

¶ 21    Several members of the Kankakee Police Department testified to their encounters with defendant or their investigation into Harris's death.

¶ 22    Officer Tracy Monferdini testified that at 12:30 p.m. on November 13, 2024, she left the Kankakee police station and headed home for lunch. During her drive, she saw a black man with a white stocking cap and a "tan and brown and white kind of patchwork-looking jacket" running north on Harrison Avenue. As she drove past, she saw his face and affirmatively identified defendant as the man in court. She did not observe defendant carrying a firearm. When she returned to the police station from lunch, defendant was being interviewed at the station.

¶ 23    Officer Shane Finley was on patrol in a squad car seven or eight blocks from the scene when he received a call at about 12:30 p.m. that there were shots fired at 500 Birch. While driving to the scene, Finley saw a man out of breath in an alleyway wearing a "brown coat, maybe tan" with a white stocking cap. Once the man saw Finley, he stopped. The man then started to run again. Finley apprehended him and brought him to the police station for questioning. He identified this

7

man as defendant. Finley later retraced his steps to where he initially saw defendant and located a handgun near a creek on Willow Street, the same street as the business "Reeds Rental All," and in about "the same vicinity" of their first encounter. Finley never saw defendant with a gun.

¶ 24        Detective Steven Hunter conducted a crime scene investigation shortly after the shooting. He located a fired bullet lodged in the ground outside of the back of the apartment complex which he sent off for analysis. He did not find any shell casings during his preliminary review of the scene. He then took photographs of the area where the gun was found. He placed the firearm in a bag and took it to the police station for further inspection by the evidence technician, Detective Scott Monferdini. There were two bullets in the magazine and one in the chamber of the weapon when recovered. The recovered bullets were not processed for DNA or fingerprints. He returned to the apartment complex at 5:30 p.m. and found five shell casings in the grass behind the building. They were also submitted for analysis.

¶ 25        Detective Monferdini testified that he swabbed the gun and magazine the day after the shooting and transported the evidence to a crime lab for analysis within a week of the shooting. Christopher Webb, an Illinois State Police forensic scientist specializing in forensic biology, analyzed those swabs and detected no human DNA. During cross-examination, Detective Monferdini briefly testified to the protocol of tracing a gun's history by receiving a report from the ATF to see who purchased the firearm. Defendant's counsel sought to introduce the ATF report received in this case and elicit Detective Monferdini's testimony that the report indicated the gun was purchased by someone other than defendant. The State objected on hearsay grounds which the court sustained following an offer of proof.

¶ 26        Illinois State Police forensic scientist Kurt Zielinski, a firearms identification expert, testified to his examination of the recovered Hi-Point Model C9, 9-millimeter semiautomatic

8

handgun, the recovered bullet, and shell casings. As part of his examination, he fired test shots from the Hi-Point handgun. The general class characteristics from the crime scene bullet matched the Hi-Point handgun and he knew of no other type of weapon that had those same characteristics. However, the individual characteristics from the bullet and test shots were inconclusive. Therefore, he could neither identify nor eliminate the recovered bullet "as having been fired from this particular firearm." He did conclude that "all five fired cartridge cases *** were fired from the Hi-Point *** pistol in this case." Cross examination focused on the inconclusive finding that the recovered bullet was fired from the Hi-Point handgun. Defense counsel did not question his conclusion that the shell casings came from the recovered gun, nor did he endeavor to cross-examine the witness concerning scientific peer reports that called into question the reliability of bullet casing identification.

¶ 27        Detective David Skelly interviewed defendant after he was apprehended on the day of Harris's death. A video of the interview was played to the jury in which defendant stated he was across the street from his residence on his way to buy drugs when he heard gunshots and ran northbound. Photographs taken at the interview depicted defendant in a white stocking cap and tan, white, and brown checkered coat covered with images of hundred-dollar bills. Skelly swabbed defendant's hands, which were analyzed by an Illinois State Police forensic scientist, Scott Rochowicz, who specializes in microscopy and trace chemistry. Rochowicz testified the swabbed samples were negative for gunshot residue, though he explained it was easy to remove gunshot residue through rubbing or wiping. Detective Monferdini later interviewed defendant on September 13, 2022, just 10 days before his indictment. A recording of the interview was played at trial, during which defendant denied shooting Harris, admitted he was at the crime scene, and

that he saw an individual named "Black" shoot Harris. According to defendant, Black was murdered in retaliation.

¶ 28    Former Police Chief Robin Passwater, who held the position of Investigations Commander on the date of the shooting, testified to his participation in the case. His department intentionally withheld information that they had recovered the Hi-Point handgun and the location of its recovery. As such, that information had not been divulged to the public when Bledson described the gun and its whereabouts to the authorities based on defendant's purported description during their phone call. Passwater traced the ownership of the gun and found it did not come back to defendant or Bledson.

¶ 29    The defense called one witness in its case-in-chief, Jessica Robinson, the operation supervisor of 911 dispatch. She reviewed the records of police communication at the time of the shooting which revealed slight discrepancies with the timeline Finley testified to concerning where, and at what time, he had apprehended defendant.

¶ 30    During its initial and rebuttal closing arguments, the State relied on Bledson's testimony and Campbell's videotaped police interview, which it stated was "as good as testimony about what happened at the time," arguing both supported the proposition that defendant had shot and killed Harris. It replayed snippets of Campbell's interview for the jury followed by the prosecutor's reiteration of key statements, such as Campbell's identification of defendant as the shooter, Bledson standing at defendant's side during the shooting, and Campbell's reasoning for not being initially forthright with authorities due to his fear of "ripple effects." It interlaid Bledson's testimony and Campbell's interview to create a single narrative of the moments surrounding the shooting, which it argued were consistent with one another. Defense counsel argued in closing that Bledson and Campbell were unbelievable, noting Campbell waited until he was in police custody

10

in 2018 and wanted something in return on his current case before speaking to the police. After deliberation, the jury returned a guilty verdict.

¶ 31 The court conducted a sentencing hearing on June 17, 2024. It denied defendant's motion for a new trial and sentenced him to a term of 45 years' imprisonment in the Illinois Department of Corrections. On June 21, 2024, defendant filed a motion to reconsider his sentence based on asserted medical problems and mental health disorders. The court denied his motion to reconsider on July 1, 2024, and the notice of appeal was filed on that date.

¶ 32 II. ANALYSIS

¶ 33 On appeal, defendant argues he was denied his constitutional right to a fair trial based on three points of error. His initial appellate contentions concern the representation he received at trial as he argues his counsel provided him with ineffective assistance in two material ways. First, he argues that the stipulation to the admission of Campbell's videotaped police interview surrendered his constitutional right to confront and cross-examine Campbell with no apparent benefit to his defense. Moreover, the stipulation precluded him from impeaching Campbell with his prior felony convictions. Second, he contends that he was rendered ineffective assistance for his counsel's failure to question Zielinski on his conclusion that tied the crime-scene shell casings to the recovered firearm and for not questioning Zielinski regarding the reliability of firearms identification as a scientific field. Unrelated to his ineffective assistance of counsel claims, defendant maintains that the circuit court erred by sustaining the State's hearsay objection and excluding the ATF report which revealed he was not the owner of the firearm in question.

¶ 34 Before considering defendant's appeal, we must address the threshold jurisdictional issue raised by his motion for leave to file a late notice of appeal which we have taken with his case.

¶ 35 A. Defendant's Motion for Leave

11

¶ 36　　　　Approximately six months into the pendency of his appeal, defendant filed a motion with this court for leave to file a late notice of appeal. According to his motion, after reviewing the preliminary documents in this matter, his appellate counsel became aware that the notice of appeal, which was prepared, signed, and filed by the circuit court clerk, violated Illinois Supreme Court Rule 606 (eff. April 15, 2024). Specifically, the notice identified the wrong judgment date and was not in the requisite form. Defendant concedes that, at the time of his motion's filing, Rule 606's deadline for amendment had lapsed. Nonetheless, he argues that he may correct these errors by perfecting his notice under Illinois Supreme Court Rule 606(c) (eff. April 15, 2024), which allows a reviewing court to extend the time for filing a notice of appeal under certain circumstances.

¶ 37　　　　The State objects to the motion on the grounds that Rule 606(c) is not a vehicle for amendment; rather, by its plain language, it affords a reviewing court discretion to allow a late filing only where no notice of appeal has been previously filed. Given defendant did file a timely notice of appeal, he is bound by the amendment deadlines within Rule 606 that have since expired, and he therefore may not amend the errors that he has identified.

¶ 38　　　　Defendant asserts in reply that the State's reading of Rule 606(c) is unduly narrow and that the provision's language concerning "the failure to file a notice of appeal" permits amendment by implying a failure to file a *correct* notice of appeal. *Id.* He also raises equitable concerns that the State's position endangers a criminal defendant's constitutional right to appeal. See *People v. Abdullah*, 2019 IL 123492, ¶ 19 (explaining that in Illinois, criminal defendants possess the fundamental right to appeal their convictions following the entry of their sentence). Should the State's position prevail, a non-party's error can deprive a defendant's right to appeal without procedural recourse—an injustice, defendant argues, that is most often visited upon indigent criminal defendants.

12

¶ 39    Reviewing courts possess an independent duty to consider jurisdictional issues. *People v. Smith*, 228 Ill. 2d 95, 104 (2008). A notice of appeal confers jurisdiction on a reviewing court (*People v. Patrick*, 2011 IL 111666, ¶ 21), and the court may only consider judgments that the notice specifies (*People v. Lewis*, 234 Ill. 2d 32, 37 (2009)). Its purpose is to notify the prevailing party that the other party seeks review of the circuit court's judgment. *Patrick*, 2011 IL 111666, ¶ 21. A notice " 'should be considered as a whole' " and successfully confers jurisdiction " 'when it fairly and adequately sets out the judgment complained of and the relief sought, thus advising the successful litigant of the nature of the appeal.' " *Smith*, 228 Ill. 2d at 105 (2008) (quoting *Lang v. Consumers Insurance Service, Inc.*, 222 Ill. App. 3d 226, 229 (1991)). A notice of appeal is generally construed liberally. *Id.* at 104.

¶ 40    However, we may not excuse the filing requirements of our supreme court's rules governing appeals. *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 217-18 (2009). Illinois Supreme Court Rule 606 sets forth the requirements of perfecting a criminal appeal. See Ill. S. Ct. R. 606(a) (eff. April 15, 2024). Rule 606(d) governs amendment to a notice and states in relevant part that a "notice of appeal may be amended as provided in Rule 303(b)(5)." Ill. S. Ct. R. 606(d) (eff. April 15, 2024). Rule 303 governs appeals from final judgments in civil cases, and 303(b)(5) permits the appellant to amend the notice of appeal without leave of court during the initial filing period. Ill. S. Ct. R. 303(b)(5) (eff. July 1, 2017). Therefore, the initial period to amend a notice of appeal without restriction under Rule 606 is within 30 days after a final judgment or 30 days after the entry of an order disposing a motion directed against the final judgment. See Ill. S. Ct. R. 606(b) (eff. April 15, 2024). Beyond the initial 30-day period, a notice may be amended only by motion pursuant to Rule 303(d). Ill. S. Ct. R. 303(b)(5) (eff. July 1, 2017). Rule 303(d) affords the reviewing court discretion to grant leave to file an amended notice

13

within 30 additional days after the filing period, provided that the motion for leave is supported by a "showing of a reasonable excuse" for failing to timely file. Ill. S. Ct. R. 303(d) (eff. July 1, 2017). Once Rule 303(d)'s additional period "has lapsed, 'the appellate court lacks jurisdiction to permit any further amendment of the notice of appeal.' " *People v. Ratliff*, 2024 IL 129356, ¶ 16 (quoting *Peters v. Herrin Community Unit School District No. 4*, 2015 IL App (5th) 130465, ¶ 22 (citing *Ebert v. Dr. Scholl's Foot Comfort Shops, Inc.*, 137 Ill. App. 3d 550, 556 (1985))).

¶ 41    In sum, Rule 606(b) and (d), in tandem with Rule 303(b)(5) and (d), provide that a reviewing court may grant a criminal defendant's request to amend a timely-filed notice of appeal within 60 days from the entry of a final judgment or disposal of a motion directed against the judgment, if the request is supported by a motion showing a reasonable excuse. See Ill. S. Ct. R. 606(b), (d) (eff. April 15, 2024); see also Ill. S. Ct. R. 303(b)(5), (d) (eff. July 1, 2017).

¶ 42    Our supreme court clarified the strictures of Rule 606's amendment deadlines in *Ratliff*, a case cited by both parties. *Ratliff*, 2024 IL 129356, ¶¶ 15-18. In *Ratliff*, a criminal defendant appealed his 15-year prison sentence after the court entered his guilty plea for robbery. *Id.* ¶¶ 1, 5. The notice of appeal expressly identified that it was the denial of his motion to reconsider his sentence, and not his conviction, being appealed. *Id.* ¶ 8. After more than six months passed, however, defendant filed a motion in the appellate court and was granted leave to amend his notice to clarify that he was appealing his conviction. *Id.* The appellate court went on to affirm his conviction and sentence. *Id.* ¶ 9.

¶ 43    The supreme court held that it was improper for the appellate court to reach the merits of defendant's challenged conviction based on his belated request to amend his notice and vacated its judgment on the grounds that it lacked jurisdiction to do so. *Id.* ¶¶ 18, 48. It reasoned that the notice conferred jurisdiction only to review the specified judgment appealed from—the order

denying the motion to reconsider his sentence—and not the order the appellate court ultimately reviewed concerning the entry of defendant's guilty plea. See *id.* ¶¶ 17-18.

¶ 44　　The State asserts *Ratliff* is instructive, Rule 606's amendment deadlines control, and we must deny defendant's request to amend his defective notice. Defendant maintains that Rule 606(c) offers a viable avenue for amendment which in relevant part provides:

> "Extension of Time in Certain Circumstances. *** on motion supported by a showing of reasonable excuse for failing to file a notice of appeal on time filed in the reviewing court within 30 days of the expiration of the time for filing the notice of appeal, or on motion supported by a showing by affidavit that there is merit to the appeal and that the failure to file a notice of appeal on time was not due to appellant's culpable negligence, filed in the reviewing court within six months of the expiration of the time for filing the notice of appeal, in either case accompanied by the proposed notice of appeal, the reviewing court may grant leave to appeal and order the clerk to transmit the notice of appeal to the trial court for filing." Ill. S. Ct. R. 606(c) (eff. April 15, 2024).

In conformity with this provision, defendant avers that he filed his motion for leave to file a late notice of appeal within six months of the initial filing period, there is merit to his appeal, and the errors on the notice were not due to his own culpable negligence.

¶ 45　　By its plain language, Rule 606(c) does not concern amendment. *People v. Knight*, 2023 IL App (3d) 220198, ¶ 21 (explaining supreme court rules are interpreted under the cardinal rule of construction by using their plain and ordinary language). Rule 606, considered in its entirety (*Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 22), affords one avenue for amendment pursuant to provision 606(d). See Ill. S. Ct. R. 606(d) (eff. April 15, 2024). The

15

language clarifying the deadline for amendment is clear and unambiguous. *Knight*, 2023 IL App (3d) 220198, ¶ 21; *Ratliff*, 2024 IL 129356, ¶ 16. Defendant moved for leave to file a late notice of appeal on January 10, 2025, more than six months after initiating his appeal, which is well beyond the amendment period. *Supra* ¶ 41. We therefore must deny defendant's motion to amend his notice, filed under the guise of a motion to file a late notice, as untimely.

¶ 46        Irrespective of this denial, we hold that the notice conferred jurisdiction upon this court to consider defendant's asserted trial errors related to his conviction. The circuit court sentenced defendant following a hearing on June 17, 2024. Subsequently, he filed a motion seeking reconsideration of his sentence, which was denied on July 1, 2024. On that date, he filed his notice of appeal. The notice discordantly features both dates; it lists the "Judgment Order Date" as June 17, 2024, and contains the following language: "Appellant hereby appeals to the Appellate Court of Illinois, 3rd District, from the Judgment Order of the Circuit Court of Kankakee County, Illinois, entered in said cause on: 7/1/2024." Therefore, as it relates to the order appealed from, the error in defendant's notice is not the identification of an incorrect judgment date, as defendant's motion suggests. Rather, its identification of two judgment dates shrouds which "Judgment Order" defendant is appealing.

¶ 47        This differs from the error presented in *Ratliff*'s notice of appeal. The defendant in *Ratliff* sought to challenge the judgment order on his accepted guilty plea entered on November 19, 2019. *Ratliff*, 2024 IL 129356, ¶ 6. However, his notice explicitly identified the judgment date as May 7, 2021—the date the court denied his motion to reconsider his sentence—and to support that as the judgment appealed from, included a paragraph stating that "If appeal is not from a conviction, nature of order appealed from: MOTION TO RECONSIDER SENTENCE." *Id.* ¶ 8; *In Re Marcus*, 2022 IL App (3d) 170014, ¶ 46 n. 4 (A reviewing court may *sua sponte* take judicial notice of

16

"public documents contained in the record of any other judicial proceeding if doing so" aids in deciding the appeal.). No such definitive language qualifies defendant's notice here.

¶ 48 Defendant's notice is distinguishable from notices that omit the judgment complained of entirely. See *Ratliff*, 2024 IL 129356, ¶ 8; see also *Smith*, 228 Ill. 2d at 103, 105. Here, while the notice identifies the appealed-from judgment order as the date defendant's motion to reconsider was denied, other indicia on the notice suggest he is appealing from his conviction. It accurately identifies his offense, sentence, and the date his sentence was entered as the "Judgment Order Date." See *Patrick*, 2011 IL 111666, ¶ 25. Applying a liberal construction to defendant's notice, we hold that it adequately apprised the State that he is appealing from his conviction. See *id.* ¶ 21. As evidenced by his appellate brief, defendant's appeal rests on challenging his conviction and thereby rectifies any confusion the State could have endured from the notice's multiple dates. *Id.* ¶ 26 ("Briefs, not the notice of appeal, specify the precise points relied upon for reversal."). Further, by specifying the date his sentence was entered as the "Judgment Order Date," we are conferred jurisdiction to consider his conviction. See *Ratliff*, 2024 IL 129356, ¶ 17.

¶ 49 We likewise conclude that the notice's incorrect form, which defendant concedes is not prescribed by Rule 606, does not present a substantive issue. *People v. Kellerman*, 342 Ill. App. 3d 1019, 1024 (2003); Ill. S. Ct. R. 606(d) (eff. April 15, 2024) (A notice shall be in or substantially adopt "the form provided in the Article VI Forms Appendix."). Where a notice's deficiency is a matter of form and not substance, we have jurisdiction "if (1) the notice fairly and accurately advises the appellee of the nature of the appeal; and (2) the appellee is not prejudiced by the deficiency in form." *Kellerman*, 342 Ill. App. 3d at 1024. The notice fairly and accurately advised the State of the nature of defendant's appeal. Moreover, we cannot conclude the State was

17

prejudiced by the notice's deficiencies, and the State makes no argument in its objection to defendant's motion that it was.

¶ 50                                B. Ineffective Assistance of Counsel

¶ 51        Turning to the merits, defendant's initial assertion is he was rendered ineffective assistance when his counsel stipulated to the admission of Campbell's videotaped police interview. Defendant argues the stipulation deprived him of his fundamental right to confront and cross-examine Campbell without any perceived benefit. Counsel also failed to impeach Campbell with his numerous prior felony convictions. The State responds that defense counsel's decision to stipulate was valid trial strategy under the circumstances and that defendant cannot establish he was prejudiced by the stipulation based on the remaining evidence adduced at trial.

¶ 52        The sixth amendment guarantees criminal defendants the right to the effective assistance of counsel. U.S. Const., amend. VI; *People v. Hughes*, 2012 IL 112817, ¶ 44. Ineffective assistance of counsel claims are governed by the familiar two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*'s two-part test). First, defendant must show that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687. To satisfy this prong, a defendant must demonstrate his counsel's performance was deficient through " ' errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *People v. Clendenin*, 238 Ill. 2d 302, 317 (2010) (quoting *Strickland*, 466 U.S. at 687). There is a strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). Matters of trial strategy are typically immune from ineffective assistance of counsel claims. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). Even so, the presumption may be overcome "where no reasonably effective defense attorney, confronted with

18

the circumstances of the defendant's trial, would engage in similar conduct." *People v. Watson*, 2012 IL App (2d) 091328, ¶ 24. A reviewing court accords deference to counsel's " 'exercise of judgment, discretion or trial tactics even where [it] would have acted differently.' " *People v. Gallagher*, 2012 IL App (1st) 101772, ¶ 25 (quoting *People v. Ingram*, 382 Ill. App. 3d 997, 1006 (2008)). We review the totality of counsel's conduct in determining whether defendant received effective assistance (*People v. Evans*, 186 Ill. 2d 83, 94 (1999)) and consider the entire record in analyzing ineffective assistance claims (*People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9).

¶ 53        Second, defendant must show that he was prejudiced by his counsel's deficient performance. *Strickland*, 466 U.S. at 687. To establish prejudice defendant must demonstrate that, but for defense counsel's deficient performance, "there is a reasonable probability that the result of the proceeding would have been different." *Clendenin*, 238 Ill. 2d at 317 (citing *Strickland*, 466 U.S. at 694). A reasonable probability means probability sufficient to undermine confidence in the outcome, *i.e.*, counsel's deficient performance rendered an unreliable trial result or the proceeding fundamentally unfair. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). Both prongs of the *Strickland* test must be proven, and failure to establish either is fatal to an ineffective assistance claim. *People v. Jackson*, 2020 IL 124112, ¶ 90. Defendant raises his ineffective assistance claim on direct appeal, which may be done "when the basis of the claim can be ascertained from the record." *Watson*, 2012 IL App (2d) 091328, ¶ 21; *People v. Veach*, 2017 IL 120649, ¶ 47 (holding that, in general, a defendant must raise ineffective assistance of counsel claims on direct review or risk forfeiting the claim).

¶ 54        Central to defendant's ineffective assistance of counsel claim is the alleged deprivation of his confrontation rights through his counsel's action. A criminal defendant possesses the fundamental right to confront witnesses against him. *People v. Campbell*, 208 Ill. 2d 203, 211

19

(2003). This right is enshrined in the confrontation clause of our federal and state constitutions, providing that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The confrontation clause confers two types of protections: " 'the right physically to face those who testify against him, and the right to conduct cross-examination.' " *People v. Hood*, 2016 IL 118581, ¶ 19 (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). Accordingly, a criminal defendant's right to confront witnesses encompasses the right to cross-examination. *People v. Kliner*, 185 Ill. 2d 81, 130 (1998); *People v. Pacheco*, 2023 IL 127535, ¶ 45. The confrontation clause is designed to ensure reliable evidence " 'by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *People v. McClanahan*, 191 Ill. 2d 127, 132 (2000) (quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990)). Defense counsel may stipulate to the admission of evidence that impinges upon a defendant's confrontation right, thereby waiving the right, if the defendant does not object to counsel's decision and "the decision to stipulate is a matter of legitimate trial tactics or prudent trial strategy." *Campbell*, 208 Ill. 2d at 217, 220-21. Defendant's ineffective assistance of counsel claim is subject to a *de novo* standard of review. *People v. Hale*, 2013 IL 113140, ¶ 15. Furthermore, we review *de novo* a defendant's claim that his or her sixth amendment right of confrontation was violated, as it presents a question of law. *People v. Barner*, 2015 IL 116949, ¶ 39.

¶ 55    For the deficient performance prong of defendant's ineffective assistance claim, the question before us is whether counsel's decision to stipulate to the admission of Campbell's videotaped police interview was sound trial strategy. To support the notion that his counsel's decision to stipulate was neither a legitimate trial tactic nor prudent strategy, defendant identifies the importance of Campbell's interview to the State's case. As a purported eyewitness, Campbell

20

recalled observing defendant confront and shoot Harris without provocation. These statements were, by and large, taken at face value by the Kankakee Police detectives conducting the interview. According to defendant, and confirmed by the video, the tenor of Campbell's interview was non-confrontational—not tantamount to a rigorous cross-examination that he was entitled to.

¶ 56 The State counters that counsel's stipulation was valid trial strategy. Admission of the videotaped interview in lieu of Campbell's live testimony prevented the State from fully examining its own material witness to elicit additional information or clarify inconsistencies in his statements. It relies on *People v. McClinton*, 2024 IL App (4th) 230667-U, ¶ 49, an unpublished order, as persuasive authority addressing a similar circumstance. Defense counsel in *McClinton*, a first-degree murder case involving a fatal shooting at a gas station in Springfield, Illinois, stipulated to the admission of a nontestifying witness's police recorded interview. *Id.* ¶¶ 5, 9. During the interview, the witness professed that while he accompanied defendant at the gas station, he overheard the victim's brother state that he was carrying a firearm, heard defendant respond that he was also carrying, saw the defendant brandish a gun at which point he left the gas station before hearing shots, and subsequently drove away with the defendant. *Id.* ¶¶ 6, 9-10. During a hearing on a motion for new trial, his counsel explained the stipulation allowed the defense to establish the fact that the victim's brother was armed. *Id.* ¶ 27. Counsel was concerned this statement would be excluded as hearsay absent the stipulation. *Id.*

¶ 57 The appellate court held that defense counsel was not ineffective for stipulating to the admission of the interview. *Id.* ¶¶ 53, 56. It reasoned that while the defense was limited to what the nontestifying witness stated during the recorded interview, so too was the State. *Id.* ¶ 49. It characterized the decision to stipulate as "strategic," and one done in "response to an unexpected" trial complication *Id.* It was unpersuaded by defendant's assertion that, on balance, the admission

21

of the nontestifying witness's interview was damaging, whereas its purported benefit—to establish the victim's brother as armed—was slight and merely cumulative when both he and another state witness testified to that fact. *Id.* ¶ 51. Rather, in upholding the reasonability of the stipulation, the *McClinton* court categorized the admitted statements complained of as "at best, tangential" to the State's case. *Id.* ¶ 56. It considered that the interview "was essential to defendant's case" in that it supported the "only plausible basis" for defendant's self-defense or mitigation arguments. *Id.* ¶ 53. While the appellate court "did not necessarily find trial counsel's decision was best," it concluded that defendant failed to "overcome the strong presumption it was reasonable." *Id.*

¶ 58    *McClinton* is distinguishable on several fronts. Notably, the record in *McClinton* included defense counsel's explanation as to why he found it appropriate to stipulate to the video interview's admission. *Id.* ¶ 27. In turn, the appellate court analyzed defense counsel's rationale which, in part, aided in determining the reasonableness of his decision to stipulate. See *id.* ¶¶ 50-52. The record in this matter does not include defense counsel's reasoning for stipulating to the admission of Campbell's interview. A related and more worrisome dissimilarity is that the *McClinton* stipulation offered an articulable benefit to the defendant's case. Casting aside cost-benefit concerns of cumulative evidence, the stipulation supported that defendant felt threatened with imminent harm based on the victim's brother's statement as the "only plausible basis" for his trial strategy. *Id.* ¶ 53. In contrast, here, defendant proceeded on his presumption of innocence. Campbell's statements made during his recorded interview directly undermined this trial strategy. Campbell's interview corroborated Bledson's testimony, identifying defendant as the shooter and as the "guy who killed" Harris.

¶ 59    We are unpersuaded by the State's position that the stipulation allowed defendant to sufficiently undermine Campbell's credibility during closing, when, had no stipulation been

22

entered, the defendant could have done so through the exercise of his right to cross-examine Campbell. Furthermore, we are unconvinced by the State's assertion that it endured any detriment akin to defendant's inability to confront and cross-examine Campbell when it had the benefit of eliciting such damaging statements via the stipulation.

¶ 60    In reviewing the entire record before us, we cannot see how the stipulation to such damaging corroborating evidence can be characterized as a legitimate trial tactic or prudent trial strategy. It cannot be characterized as such in this instance where defendant received virtually no benefit from his counsel's stipulation. See *Campbell*, 208 Ill. 2d at 220 (explaining defense counsel's stipulation to nontestifying witness's testimony was a matter of sound trial tactics where counsel used the stipulation to establish defendant's lack of criminal intent in residential burglary case); see also *Clendenin*, 238 Ill. 2d at 307-08, 325-26 (noting case presented by stipulation preserved suppression issues for review which was in line with pursued defense strategy). Therefore, examining defense counsel's conduct as a whole, the decision to stipulate to the admission of Campbell's videotaped interview was unsound and "no reasonably effective defense attorney, confronted with the circumstances of the defendant's trial, would engage in similar conduct." *Watson*, 2012 IL App (2d) 091328, ¶ 24.

¶ 61    We also hold that defendant was prejudiced by his counsel's stipulation. Regarding *Strickland*'s prejudice prong, we conclude that there is a reasonable probability that, absent the admission of Campbell's interview, the jury would have had a reasonable doubt respecting defendant's guilt. *Strickland*, 466 U.S. at 695.

¶ 62    The State argues that even without the admission of Campbell's videotaped interview, the trial evidence overwhelmingly supports defendant's conviction. We disagree. The significance of Campbell's videotaped interview to the State's case was anything but tangential. See *McClinton*,

23

2024 IL App (4th) 230667-U, ¶ 56. The State's reliance on Campbell's interview in its closing argument reveals its significance. During closing, the State explained its burden as follows:

"To sustain the charge of first-degree murder, the State must prove the following propositions: [f]irst proposition, that the defendant performed the acts which caused the death of DeArrion Harris; second proposition, that when the defendant did so, he intended to kill DeArrion Harris or he knew that his acts create[d] a strong probability of death or great bodily harm to DeArrion Harris." See 720 ILCS 5/9-1 (West 2022).

To support that it satisfied the first proposition, the State relied on Bledson and Campbell's accounts as eyewitnesses to the shooting. While making only a passing reference to Campbell in its opening statement, it freely acknowledged that the jury would not like Bledson due to his lengthy criminal background. Its closing argument repeated that sentiment by asserting that Bledson "is a convicted felon looking for some kind of consideration."

¶ 63 The State referenced Campbell's interview over a dozen times in its closing arguments. It repeatedly utilized the interview to bolster Bledson's live testimony by arguing that: Campbell also saw defendant shoot Harris, both Bledson and Campbell knew defendant, both Bledson and Campbell "pointed" out defendant as the shooter, there were no inconsistencies between Bledson's testimony and Campbell's statements, neither Bledson's testimony nor Campbell's statements were impeached, Campbell heard the same thing Bledson did at the time of the shooting, they saw the same thing, and their description of the positions of Harris and defendant at the crime scene were consistent and explained the location where the bullet casings were recovered.

¶ 64 The State similarly used Campbell's interview to bolster Larusso's testimony. Larusso was present at the scene on the date of the shooting. His trial testimony, however, diverged from the

24

statement that he provided to the authorities the day after the shooting. Namely, he testified that he did not see defendant in a brown coat that day, did not look back when a voice called after him to "check it out" during his first visit to Harris's apartment, and did not see who Harris was arguing with during that visit. He testified that he told the police he saw defendant in a brown coat because other "people" had told him that the perpetrator wore a "money coat, *** a leather jacket," and the police showed him two photographs of defendant in a brown coat. He did not recall identifying the defendant in the photo array despite the State publishing a recording of this identification to the jury.

¶ 65    The State argued in closing that Larusso's testimony was corroborated by both Campbell and Bledson, and in rebuttal, that Campbell's statements were consistent with that of Bledson and Larusso. Lastly, Campbell's interview indicated that he previously told the police in 2014 that he did not witness the shooting and that he lied because he feared "ripple effects." The State argued this figure of speech meant he was fearful of being killed. The State employed this phrase to explain both why Bledson fled the scene and did not talk to the police until he was in custody months later, and why Larusso's testimony diverged from his earlier statement.

¶ 66    In the absence of the stipulation to the Campbell interview, the State had a case with one eyewitness to the shooting in Bledson who had a criminal record and arguably, as someone in business with defendant, had the same motive to harm Harris, a competitor. It is evident from the record that the State relied heavily on Campbell's interview to bolster its case. In reaching that conclusion, we find notable that no charges were levied against defendant in the nearly eight years that elapsed between Harris's death and defendant's indictment, that nearly four years elapsed between Campbell providing his initial statement and sitting for his interview, and another nearly

25

four years elapsed between Campbell's recorded interview and the levy of charges against the defendant.

¶ 67　　　Given its importance to the State's case, we conclude that counsel was ineffective in stipulating to the admission of the Campbell interview, thus waiving both defendant's right to cross-examination and depriving defendant the opportunity to impeach Campbell with his criminal record. The State argues it is enough that Campbell was in custody during his interview and the stipulation clarified that the interview was conducted pursuant to a signed proffer agreement. We consider that a poor substitute for undermining credibility during cross-examination. *People v. Butler*, 2025 IL 130988, ¶ 51 (" 'Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.' " (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974))). We further conclude that there exists a reasonable probability that the outcome would differ in the absence of the stipulation given the damaging nature of statements introduced through Campbell's interview and the State's heavy reliance on the interview to corroborate Bledson and Larruso's testimonies. We hold that defendant received ineffective assistance of counsel based on the stipulation to the admission of Campbell's interview, and we reverse on that ground. Therefore, we need not reach the remaining points of error defendant alleges on appeal.

¶ 68　　　　　　　　　　　　　III. CONCLUSION

¶ 69　　　The judgment of the circuit court of Kankakee County is reversed, and this cause is remanded for a new trial.

¶ 70　　　Reversed and remanded.